## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ACLCP CINCINNATI, LLC, *et al.,* [1]<br><br>    Debtors. | Case No. 25-11691 (MFW)<br>(Joint Administration Pending) |
| ACLCP PORT HURON, LLC<br>ACLCP GRATIOT, LLC,<br>ACLCP CINCINNATI, LLC,<br><br>    Plaintiffs,<br><br>V.<br><br>CVS CAREMARK CORP., OHIO CVS STORES, L.L.C., HOOK-SUPERX, L.L.C., SOUTH CAROLINA CVS PHARMACY, L.L.C., TENNESSEE CVS PHARMACY, L.L.C., WOODWARD DETROIT CVS, L.L.C., CVS MICHIGAN, L.L.C., PHILIP KASSOVER, JEROME AND PAULA GOTTESMAN FAMILY SUPPORTING FOUNDATION, INC., COMMUNITY FOUNDATION OF NEW JERSEY, NORTH VERNON REMAINDERCO, LLC, CINCINNATI REMAINDERCO, LLC AND WALTERBORO REMAINDERCO, LLC,<br><br>    Defendants. | Adv. Proc. No. _____ |

## <u>COMPLAINT</u>

Plaintiffs ACLCP Port Huron, LLC, ACLCP Gratiot, LLC, and ACLCP Cincinnati, LLC

(collectively, the "Debtors"), each a debtor and debtor in possession in the above-captioned chapter

11 case, by and through undersigned counsel, hereby allege for their complaint against CVS

Caremark Corp., Ohio CVS Stores, L.L.C., Hook-Superx, L.L.C., South Carolina CVS Pharmacy,

---

[1] The Debtors in these Chapter 11 cases are ACLCP Cincinnati, LLC, ACLCP Gratiot, LLC, and ACLCP Port Huron, LLC.

1

L.L.C., Tennessee CVS Pharmacy, L.L.C., Woodward Detroit CVS, L.L.C., CVS Michigan, L.L.C., Philip Kassover, Jerome and Paula Gottesman Family Supporting Foundation, Inc., Community Foundation of New Jersey, North Vernon Remainderco, LLC, Cincinnati Remainderco, LLC and Walterboro Remainderco, LLC (collectively, the "Defendants") as follows:

## PRELIMINARY STATEMENT

1.     This matter seeks to finally put to rest chaos initiated by certain current or former tenants of the Debtors:  Ohio CVS Stores, L.L.C., Hook-Superx, L.L.C., South Carolina CVS Pharmacy, L.L.C., Tennessee CVS Pharmacy, L.L.C., Ohio CVS Stores, L.L.C., Woodward Detroit CVS, L.L.C., CVS Michigan, L.L.C. (collectively, the "CVS Tenant Entities"), all being subsidiaries of CVS (as defined below).  The chaos was intentionally manufactured by CVS and the CVS Tenant Entities based on old, disproven, meritless and unfounded title claims to the Properties (as defined below) and the entities (the "Original LLCs") that originally owned them. These claims are being asserted by serial litigant, defendant Philip Kassover ("Kassover"), who correctly alleges to be a creditor of a prior affiliate of the Debtors, but falsely claims that – somehow – he personally has become the owner of all the Properties and all the Original LLCs and that the Original LLCs now continue in existence notwithstanding valid and lawful mergers in 2024 (the "2024 Mergers") that eliminated them and definitively cancelled any interest Kassover could possibly have had in respect of the ownership of the Original LLCs or the Properties.

2.     CVS and the CVS Tenant Entities have long known that Kassover's claims of ownership are meritless, but, in December 2023, they decided to use them as the false justification (i) to withhold from the Debtors all the rents payable in respect of the Properties and (ii) to commence and continue, in bad faith, five legal actions to interplead those funds in various courts

around the United States (collectively, the "Interpleader Cases"). This conduct was intended to and in fact did starve the Debtors of operating capital and other revenue critical to the financial survival of the Debtors. It was a volitional tactic by CVS and the CVS Tenant Entities with no real purpose other than to harm the Debtors, deprive them of all operating funds, cloud the title to all the Properties, so as to prevent sale or financing transactions that could generate funds, and otherwise make impossible the continuation of the Debtors' business.

3.      These spiteful and deliberate actions were taken by CVS and the CVS Tenant Entities for a sole purpose: to coerce the Debtors and their affiliates into compromising or writing off over $7 million of claims against the CVS Tenant Entities and CVS that the Debtors and their affiliates are currently pursuing. The hydraulic pressure created on the Debtors by these tactics has left the Debtors with no viable alternative but to seek relief in this Court to gain access to over $2 million of the Debtors' own wrongfully interpleaded funds (the "Funds") and otherwise to raise money to continue to fight the Kassover claims and several additional claims that have arisen after the Interpleader Cases were started by CVS.

4.      To finally end any question about who owns the Properties and is entitled to the rents from the  Properties, and to permit the Debtors to emerge from bankruptcy with their assets free and clear of meritless claims and disputes, this action seeks a declaration that the 2024 Mergers were valid and lawful and effective to constitute the Debtors as the lawful successors to the Original LLCs, that the Debtors therefore are sole owners of the Properties, that the Defendants do not have claims or interests in the Properties, and that the Debtors have the sole right to possession of all the Funds that are currently due to the Debtors but are being wrongly withheld in the Interpleader Cases, and all future rents from the Properties.

5.      The Debtors seek a judgment against Kassover, once and for all, dismissing his

serial meritless claims and statements of ownership of the Original LLCs, the Debtors and the Properties.  The Debtors also seek a judgment against the Defendants Gottesman and CFNJ (each as defined below) and entities owned by them, dismissing meritless claims of ownership of three of the Properties interposed by them as intervenors in the Interpleader Cases.  Such judgment should further declare that the 2024 Mergers and the 2025 Merger (as defined below) are not void, but valid, and that (i) the Debtors are limited liability companies formed and validly existing under the laws of the State of Delaware and each is the owner of the Property or Properties claimed to be owned by it; (ii) Debtor ACLCP Port Huron, LLC is wholly owned by ACLCP Managerco, LLC; (iii) Debtor ACLCP Cincinnati, LLC is 65% owned by Defendant Cincinnati Remainderco, LLC  and 35% owned by its managing member, non-debtor ACLCP Managerco, LLC; (iv) Debtor ACLCP Gratiot, LLC is 65% owned by an entity not involved in this case and 35% owned by its managing member, non-debtor ACLCP Managerco, LLC .

6.      The Debtors also seek a judgment against CVS and the CVS Tenant Entities for causing this chaos, and the Debtors' petition for protection under the Bankruptcy Code.  CVS and the CVS Tenant Entities have breached their contracts with the Debtors, breached their duty of good faith and fair dealing, and tortiously interfered with the Debtors' numerous contracts relating to the Debtors' operations and title to the Properties.  CVS and the CVS Tenant Entities have acted with malice and wanton disregard of undisputable facts in an attempt to crush the Debtors.

7.      The Debtors seek a judgment and implementing Order directing any party holding any of the Funds to turn the Funds over to the Debtors, subject to further Order of the United States Bankruptcy Court for the District of Delaware.  The Funds are property of the Debtors, but under any circumstance, any party who has ever asserted any interest in the Funds (albeit baseless) is a Defendant hereto.

8.      Finally, the Debtors seek a judgment disallowing claims of all Defendants.

## NATURE AND STAGE OF PROCEEDINGS

9.      The Debtors are corporate successor entities to the Original LLCs, which were a group of single member, "bankruptcy-remote" limited liability companies formed in 2001 and 2002 to acquire, finance and lease nine properties (the "Properties") to subsidiaries of CVS Caremark Corp. ("CVS") to be operated as retail drugstores.  For many years, prior to the payoff of the securitized debt used to purchase the Properties, the Original LLCs were prohibited from commingling funds, having a bank account, incurring other debt or consolidating their businesses into a single vehicle.  Nevertheless, in compliance with those prohibitions, which ceased to have effect a number of years ago upon repayment of the applicable loans, the Properties and the Original LLCs, as the predecessor entities of the current Debtors, were always operated as a single business enterprise.

10.      In 2024, for the reasons described below, the Original LLCs were the subjects of the 2024 Mergers, which were transactions intended to preserve the ownership of the Properties from a meritless attack on their titles by Defendant Kassover and to provide support and funding to combat such attack.  The Debtors believe that the 2024 Mergers were absolutely essential transactions that were necessary to preserve their existence and their interests in the Properties to the date hereof. Another merger (the "2025 Merger") was entered into in August 2025 to simplify and consolidate the holdings and corporate structure of the Debtors, reduce expenses and prepare the post-merger Debtors for existence as a reorganized business pursuant to a reorganization plan anticipated to be filed imminently in the Debtors' chapter 11 case.

11.      On September 10, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware.

12.     The Debtors continue to operate their business and manage their assets as Debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of this Complaint, no trustee, examiner or committee has been appointed in the Debtors' chapter 11 case.

## THE PARTIES

13.     Each Debtor is a limited liability company formed under the laws of the State of Delaware.  Each Debtor is or was a party to one or more valuable commercial lease agreements for real property with CVS or a CVS Tenant Entity.

14.     Defendant Kassover is an individual residing in the State of New York.  Kassover claims to be a judgment creditor of and the permanent attorney-in-fact for non-party GCC Realty Company, LLC ("GCC"), a Delaware limited liability company that many years ago was an affiliate of certain predecessor entities of the Debtors. GCC was a debtor in two bankruptcy proceedings from 2008 to 2016 and ceased to be affiliated with the Debtors in or around 2011, when all interests in GCC were abandoned and became the custodial property of the state of Florida.  For over two decades, in nearly a dozen cases in as many states, Kassover has unsuccessfully pursued claims similar to those that have been alleged in respect of the Properties; none of such claims has ever been sustained.

15.     Defendant CVS is a business entity organized and existing under the laws of the State of Rhode Island with a principal place of business at 1 CVS Drive, Woonsocket, RI 02895. CVS controls each CVS Tenant Entity and directs the actions of each CVS Tenant Entity.

16.     Each Defendant CVS Tenant Entity – Hook-Superx, LLC (Delaware), South Carolina CVS Pharmacy L.L.C. (South Carolina), Ohio CVS Stores, LLC (Ohio) and Tennessee

CVS Pharmacy LLC (Tennessee) – is an entity formed and existing under the laws of the state identified in the parenthesis adjoining its name above.

17.     Defendant Jerome and Paula Gottesman Family Supporting Foundation, Inc. ("Gottesman") is a not-for-profit corporation formed under the laws of the State of New Jersey. Its alleged interests in two of the Properties were obtained through a tax evasion scheme, a so-called "listed transaction" which, if it had not been discovered and disallowed by the IRS, would have allowed the corporate contributor of those alleged interests to claim a tax deduction approximately six times the price the contributor paid for the interests only months earlier than the contribution.

18.     Defendant North Vernon Remainderco, LLC ("NV Remainderco") is a Delaware limited liability company that is allegedly owned and controlled by Gottesman. It is the alleged direct owner of one of the interests in the Properties claimed by Gottesman.

19.     Defendant Cincinnati Remainderco, LLC ("C Remainderco") is a Delaware limited liability company that is allegedly owned and controlled by Gottesman. It is the alleged owner of another one of the direct interests in the Properties claimed by Gottesman.

20.     Defendant Community Foundation of New Jersey ("CFNJ") is a not-for-profit corporation formed under the laws of the State of New Jersey. Like Gottesman, it also obtained its alleged interest in one of the Properties through a "listed transaction" tax evasion scheme, which possibly allowed the contributor of its alleged interest to claim a tax deduction approximately six times the price the contributor paid for the interest only months earlier than the contribution.

21.     Defendant Walterboro Remainderco, LLC ("WB Remainderco" and, together with C Remainderco and NV Remainderco, the "Remaindercos") is a Delaware limited liability company that is allegedly owned and controlled by CFNJ. It is the alleged owner of the direct interest in one of the Properties claimed by CFNJ.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 542, and Bankruptcy Rule 7001.  This is a core proceeding as it relates to the administration of the Debtors' estate, a declaration of claims and interests in the Debtors' property, and turnover of property that belongs to the Debtors.

23.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

24.     Pursuant to Local Bankruptcy Rule 7008-1, the Debtors state that they consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

### A.  *CVS Initiates Interpleader Actions to Wrongfully Withhold Rent*

25.     In December 2023, CVS and the CVS Tenant Entities suddenly and disingenuously claimed that, as a result of the tired and already disproven claims of Kassover to the Properties, they could not figure out who was owed the rents due under their respective leases with the Debtors.  But this was a ruse.  In fact, CVS well knew that the Kassover claims were meritless.

26.     The real reason CVS and the CVS Tenant Entities feigned concern about the Kassover claims was that CVS desired to exert unfair pressure on the Debtors' control parties to settle over $7 million of claims they and their affiliates held against CVS and its affiliates.

27.     On or about February 1, 2024, CVS and the CVS Tenant Entities maliciously and in bad faith instituted the five Interpleader Cases, effectively freezing all rent payments to the Debtors and trapping those Funds in courts around the United States where the Funds still sit today.

28.     At the time of filing the Interpleader Cases and as of the Petition Date, CVS and the CVS Tenant Entities knew that the claims of Defendant Kassover were entirely meritless, and that similar claims by Defendant Kassover founded on the same facts had been previously dismissed by Judge Goldblatt of this Court in the 2023 bankruptcy case of AP Orangevale, LLC ("AP Orangevale"), an affiliate of the Debtors.[2]

29.     The Interpleader Cases were also filed **_after_** delivery by the Debtors to CVS of indisputable proof that the claims of Defendant Kassover were baseless and had no merit whatsoever.  Such proof was intentionally ignored by CVS, which, on information and belief, performed no inquiry or diligence to confirm the matters therein.  Copies of the materials provided to CVS confirming the lack of merit in the Kassover claims are annexed to this Complaint as Exhibit A.

30.     In addition to having first- hand knowledge (obtained through its direct participation in the AP Orangevale case) that the Kassover claims were meritless, CVS also knew that the Kassover claims—even if true—could never exceed $2 million and that, in the absence of the 2024 Mergers (which Kassover alleges are void), the assets against which Kassover's claim could be satisfied (and therefore the maximum financial risk to CVS) could never exceed $377,000[3].  In contrast to these figures, CVS also knows that the value of the Properties in January 2024 was in excess of $15 million.  The huge disparity in these figures underscores dramatically

---

[2] Attached to this Complaint as Exhibit B is a copy of the written decision of Judge Goldblatt disallowing Kassover's claims in the AP Orangevale case.

[3] This result would obtain because, if the 2024 Mergers never happened or were declared void as demanded by Kassover, the Debtors' predecessors in interest (from which entities Kassover alleges his claims derive) would only have been entitled to receive approximately $377,000 of rents from the Properties before the remainder interest created in the TOYs Structure (see infra) vested in possession sometime in 2024. Thus, if the 2024 Mergers are void as alleged by Kassover, his interest in the Properties would be limited only to the modest remaining values of the estates for years held by the Original LLCs.

the fact that CVS could not possibly have been acting in good faith when it threatened to file the Interpleader Cases in 2023, when it refused to engage with the Debtors after the Debtors provided proof of the foregoing matters in 2024, when it spitefully filed the multiple Interpleader Cases and even now in 2025 as it continues to prosecute those cases when the total of interpleaded funds is more than six times greater than the maximum amount that Kassover could ever possibly hope to recover from the Properties or CVS.

31.     On information and belief, CVS and the CVS Tenant Entities filed the Interpleader Cases to effectively cloud the titles of the otherwise unencumbered Properties – which were not subject to any secured debt – and starve the Debtors of operating capital and thereby force the Debtors and an affiliate of the Debtors, AP Orangevale, to compromise or abandon multiple claims against CVS and the CVS Tenant Entities and other affiliates of CVS.  With the commencement of the Interpleader Cases and the clouded titles of the Properties, the Debtors had absolutely no source of funds and could not sell, transfer or even obtain financing with respect to the Properties to fund the Debtors' operations and litigation.

32.     The true purpose and intended effect of the Interpleader Cases was to harm the Debtors and their affiliates, not to protect CVS and the CVS Tenant Entities.  It worked out just as CVS and the CVS Tenant Entities intended. To defend the Interpleader Cases, the Debtors were forced to hire three sets of counsel in five jurisdictions.  To date, the defense of the five Interpleader Cases in five separate District Courts has already cost the Debtors hundreds of thousands of dollars and has rendered the Debtors insolvent despite their having full entitlement to the over $2.2 million of Funds held in suspense in those courts on spurious and unfair grounds. This figure is not inclusive of over $3 million owed by CVS to AP Orangevale and over $1.5 million owed to Debtor ACLCP Port Huron, LLC in respect of the South Euclid, Indiana Property.

29.    By abusing the interpleader process to withhold millions of dollars in rent from the Debtors and their non-debtor affiliates and causing them to spend hundreds of thousands of dollars on legal and other costs in at least six separate cases, CVS and the CVS Tenant Entities expect to hobble the common business enterprise engaged in by the Debtors and other affiliates and to kill that enterprise by a thousand cuts or force it to needlessly compromise debts owed by CVS to the enterprise in an amount in excess of $7 million.

30.    But the harm to the Debtors did not stop there.  Following the institution of the Interpleader Cases, Defendants Gottesman, C Remainderco, NV Remainderco, CFNJ and WB Remainderco intervened in the cases, and have now made their own unfounded claims that three of the 2024 Merger transactions described below are somehow void, and that as a consequence of such voidness, those Defendants in fact own 100% of the equity interest in three of the Original LLCs, which they claim somehow continue in existence notwithstanding the 2024 Mergers.

31.    In addition to being factually baseless, these claims ignore the massive investments of time and money made by the Debtors to preserve the value of the interests of the Remaindercos in the Original LLCs (all of which would have been wiped out in the absence of such investments). Instead of recognizing these investments from which they directly benefitted and accepting the obvious validity of the 2024 Mergers, the Remainderco Defendants, Gottesman and CFNY claim without any proof whatsoever that they now own full and free title to the three Properties in Cincinnati, North Vernon and Walterboro. Like the claims of Defendant Kassover that inspired the claims of the Remainderco Defendants, Gottesman and CFNY, these baseless and unsupported "me too" claims are false.

B. *The Debtors and the Properties*

32.     Predecessors of the Debtors, the Original LLCs, were formed in Delaware in or around October 2001 or sometime in 2002. Each owned a single Property that would be leased to CVS or a CVS Tenant Entity.  The Original LLCs were then known as SCP 2001A-CSF-51 LLC, SCP 2001A-CSF-18 LLC, SCP2001A-CSF-75 LLC, SCP 2001A-CSF-72 LLC, 2001A-CSF-76 LLC, SCP2001A-CSF-61 LLC, SCP 2002E-35 LLC, and SCP 2002E-36 LLC.

33.     Each Original LLC was originally acquired by an affiliate of GCC in 2002 or 2003 and held and operated  by that affiliate as a single member limited liability company. In order to effectuate tax and investment strategies then being pursued by GCC and its successors, for each Original LLC, the single ownership and member interest in the Original LLC was temporally bifurcated to create a current interest, known as the "term of years interest," and a future interest, known as the "remainder interest." The bifurcation was accomplished pursuant to an assignment instrument governed by New York law (the "TOYs Assignment").  The TOYs Assignment provided that, for approximately 22 years and until the remainder interest vested in possession in the identified owner thereof (each, a "Remainder Party"), the estate for years owner was—for all purposes--the sole member of the Original LLC, having all rights of ownership, voting and control over the Original LLC as if there were no remainder interest.  During this 22-year period, only the term of years party had the right to vote in any matter affecting the Original LLC and to exercise exclusive control over the Original LLC.  The Remainder Party had no such rights at all—its rights were strictly limited to the matters set forth in the TOYs Assignment and could only be asserted against the assignor under the TOYs Assignment.  The TOYs Assignment further provided that upon a date certain more than 2 decades later, the ownership and control of the estate for years owner would cease and all the same rights of ownership, voting and control over the Original LLC

would vest in the Remainder Party.  These separate present and future estates were ultimately purchased and held by different investor groups. This structure is referred to herein as the "TOYs Structure."

34.     Notably, the TOYs Structure was applied *only* to the equity member interest in an LLC that owned a parcel of mortgaged property, ***not to the title of the particular parcel of real estate itself***.  This structure resulted in "structural subordination" of the remainder and made the risks attendant to ownership of a TOYs Structure remainder far greater than those associated with ownership of a recorded remainder interest in the real estate itself.  In the TOYs Structure, the value in the remainder estate could be destroyed or diminished at any time in the 22-year period before vesting in possession by any number of factors that would not have a deleterious effect on a true real estate remainder interest. These factors include mortgage or tax lien foreclosure, failure or insolvency of the tenant of the realty, or title claims against the real property such as the Kassover claims.  All these matters involving *in rem* or property-level obligations or claims could wipe out the value of the both the TOYs Structure remainder interest and the TOYs Structure present interest because any loss of the real property imbedded within the TOYs Structure transaction would render both TOYs Structure estates (term of years and remainder) valueless interests in an LLC that had no assets.  Thus, the TOYs Structure remainder interests were highly risky and tenuous in nature and highly subject to premature wipe-out as a practical matter; for them to have any material value at all, the holder of the present (term of years) interest must vigilantly enforce all rights against tenants and others and defend against matters such as adverse title claims and tenant lease breaches for literally decades so that the remainder interest remains as originally structured for the 20-plus years before it was scheduled to vest in possession.

35.     As a result of actions by Kassover and CVS and the CVS Tenant Entities, the

Original LLCs became insolvent and unable to protect their interests in the Properties as was intended. Accordingly, in the circumstance present here, a total wipe out of all interest holders would have occurred if the 2024 Mergers had not been implemented. A remainder interest recorded against land in the applicable land records does not have these risks and contingencies and would have survived any and all of the problems that befell the Original LLCs, as the holders of the indirect and subordinated present interest in the Properties.

36.     Though risky and tentative in nature, a significant benefit of the TOYs Structure was that it could be implemented at a far lesser cost than a similar regime of real estate remainders, and it had inherent tax benefits because, for all purposes and at all times, the respective Original LLC would always be a "single member" entity to be treated as to all persons and entities as a single purpose, "disregarded entity" for tax and financing purposes. This single member status was critical at the time the Toys Structure was implemented because its unique structure did not violate the terms and conditions of the loans that were incurred to finance the acquisition of the Properties by the Original LLCs.

37.     Initially and for many years, each CVS Tenant Entity, or CVS itself, paid its net rent for occupation of its respective Property directly to the applicable lender that held the Loan[4] which originally encumbered each Property. The Loan encumbering each Property was paid in full and retired in either 2012 or 2013. Pursuant to each lease with a CVS Tenant Entity (each, a "Lease"), after retirement of the related Loan, the CVS Tenant Entity became entitled to a rent "holiday" period ("Rent Holiday Period") during which no monthly rent payments would be due to either the holder of the Loan or to the Original LLC. The Rent Holiday Period for all Properties

---

[4] The terms "Loan" or "Loans" refers to the money borrowed by the owners of the Properties to purchase the Properties, which Loan or Loans was secured by the respective Property purchased with such Loan proceeds.

and Leases other than the Gratiot Property and the Port Huron Property expired on January 31, 2024. The Rent Holiday Period for the Gratiot Property and the Port Huron Property is scheduled to expire January 31, 2028.

38.     Pursuant to the Leases, following the expiration of a Rent Holiday Period in respect of a Property, monthly rent payments were due to recommence by CVS or the applicable CVS Tenant Entity.  Those payments were supposed to be paid directly to the Debtors, commencing in January 2024 with respect to all Properties other than the Gratiot Property and the Port Huron Property.  CVS and the CVS Tenant Entities failed to make those payments and instead filed the sham Interpleader Cases as a gimmick to prevent the Debtors from receiving the rents to which they were duly entitled.

39.     As a result of CVS's malicious intention to withhold rents from the Properties, which was first announced to the Original LLCs in December 2023, the Original LLCs knew that, going forward for a substantial period, they would receive absolutely zero dollars of income despite being entitled to receive many hundreds of thousands of dollars of rents per month.  The Original LLCs also knew that, if some remedial financial transactions were not implemented as soon as possible, they would not be able to fulfill any of their obligations to vendors, taxing authorities, lawyers, accountants, insurers, corporate representatives and others. They would not even have sufficient funds to maintain the Properties or pay franchise taxes, entity fees, and statutory representative fees to remain in existence as legal entities.

40.     The Original LLCs also knew that Kassover would be aggressively propounding his meritless claims of ownership of the Properties in multiple courts and that the costs of defending those claims would be very substantial. All these realities were also known to and

anticipated to occur by CVS, and their consequences to the Original LLCs were precisely as CVS had intended them to be when it filed the Interpleader Cases in the first place.

41.    The Original LLCs further understood that if they did nothing to raise funds and engage professionals to oppose Kassover that the Properties would be lost to Kassover with the consequence that both the Remainder Parties and the Debtors themselves would suffer a complete wipe-out of any value in their respective interests because of the structural subordination features inherent in the Remainder Structure. Through its malicious filing of the Interpleader Cases, CVS knew of, anticipated and intended to create these wipe-outs, all to harm the future Debtors.

43.    After considering all the ramifications of the matters described above, the Original LLCs determined that the best way to protect the Properties and all stakeholders therein, including the Remainder Parties that remained in existence, was to implement merger transactions that would eliminate the bifurcated nature of the equity in the Original LLCs, thereby making loan financing available, while at the same time providing a mechanism to compensate such Remainder Parties for the actual value of their remainder interests.  In addition, because the Delaware law concerning mergers of limited liability companies contained provisions by which interests such as those falsely claimed to be owned by Kassover could be eliminated, the Original LLCs  believed that merger transactions could effectively counteract the cloud of title that the Kassover claims created and allow for sale and leasing transactions that were crucial to the continued existence of the Original LLCs' business.

44.    Accordingly, the 2024 Mergers were structured to accomplish all the objectives and results mentioned above.

45.    All the above considerations and structuring decisions were made in good faith by the management of the Original LLCs and with the belief that they were beneficial to the Original

LLCs and the Remainder Parties that were then in existence and had not abandoned their remainder interests.

46.    The 2024 Mergers were fair and reasonable in the circumstances and provided significant benefits to the future Debtors in enabling them to combat the Kassover claims, and the other false claims made by Gottesman, CFNJ and the Remaindercos that were inspired by the Kassover claims. They also preserved the interest of all stakeholders in respect of the beneficial ownership of the Properties, including the Remaindercos that had not abandoned their remainder interest or had ceased to exist under applicable law.

47.    By virtue of the 2024 Mergers, in January 2024, each of the Original LLCs was merged into and with a new company (each, an "ACLCP Company") in transactions which cancelled the Toys Structure remainder interests and converted them to common equity interests in the ACLCP Company with a right of appraisal in all cases except those cases where the Remainder Party had abandoned the remainder interest or the Remainder Party had ceased to exist under applicable law.

48.    Each of the new ACLCP Companies was formed on December 22, 2023 for the purpose of engaging in the 2024 Mergers and owning, managing, financing and leasing a Property. Each of the ACLCP Companies was the surviving entity in a 2024 Merger and by virtue of the applicable 2024 Merger became the owner in fee simple absolute of the Property that was owned by the Original LLC that was party to the 2024 Merger with such ACLCP Company.  A non-debtor entity, ACLCP Managerco, LLC was the sole member of each ACLCP Company after giving effect to the 2024 Mergers, except for ACLCP Cincinnati, LLC (which by reason of the 2024 Mergers is owned by C Remainderco (as to a 65% common member interest) and non-debtor ACLCP Managerco, LLC (as to a 35% managing member interest) and ACLCP Gratiot, LLC

(which is owned by a party unrelated to this case (as to a 65% common member interest) and non-debtor ACLCP Managerco, LLC (as to a 35% managing member interest).

49.     Effective as of August 27, 2025, all the ACLCP Entities, except Debtors ACLCP Cincinnati, LLC and ACLCP Gratiot, LLC, were consolidated and merged into Debtor ACLCP Port Huron, LLC in the 2025 Merger. By operation of the 2025 Merger, ACLCP Port Huron, LLC is now the owner of all the Properties except the Cincinnati Property and the Gratiot Property.

50.     The following summary identifies the respective Properties, the locations thereof, the merger history of the original owner thereof, and the Funds withheld in respect of such Property and deposited in connection in one or more Interpleader Cases:

- The "Cincinnati" Property is located at 2522 Vine Street, Cincinnati, OH and was originally owned by SCP 2001A-CSF-51 LLC; this entity was merged into ACLCP Cincinnati, LLC in a 2024 Merger transaction pursuant to an Agreement and Plan of Merger dated January 5, 2024, a copy of which is attached to this Complaint as Exhibit C.  As of the date of this Complaint, $688,454 of the rents trapped in the Interpleader Cases are attributable to this Property. ACLCP Cincinnati, LLC was not a party to the 2025 Merger and is a Debtor.

- The "Gratiot" Property is located at 10652 Gratiot Avenue, Detroit, MI and was formerly owned by SCP 2002E-35 LLC; this entity was merged into ACLCP Gratiot, LLC in a 2024 Merger transaction  pursuant to an Agreement and Plan of Merger dated January 5, 2024, a copy of which is attached to this Complaint as Exhibit D.  As of the date of this Complaint, the rent holiday provision in the Lease is still operable and no rent is due until early 2028.

Accordingly, none of the rents trapped in the Interpleader Cases are attributable to this Property. ACLCP Gratiot, LLC was not a party to the 2025 Merger and is a Debtor.

- The "North Vernon" Property is located at 14 Main Street, North Vernon, IN and was formerly owned by SCP 2001A-CSF-18 LLC; this entity was merged into ACLCP North Vernon, LLC in a 2024 Merger transaction pursuant to an Agreement and Plan of Merger dated January 5, 2024, a copy of which is attached to this Complaint as Exhibit E.  As of the date of this Complaint, $452,970of rents trapped in the Interpleader Cases are attributable to this Property. ACLCP North Vernon, LLC was merged into ACLCP Port Huron, LLC in the 2025 Merger.

- The "Walterboro" Property is located at 555 Robertson Boulevard, Waterboro, SC and was formerly owned by an entity named SCP2001A-CSF-75 LLC; this entity was merged into ACLCP Walterboro, LLC in a 2024 Merger transaction pursuant to an Agreement and Plan of Merger dated January 5, 2024, a copy of which is attached to this Complaint as Exhibit F. As of the date of this Complaint, $392,495 of the rents trapped in the Interpleader Cases are attributable to this Property. ACLCP Walterboro, LLC was merged into ACLCP Port Huron, LLC in the 2025 Merger.

- The "Kingsport" Property is located at 128 West Stone Drive, Kingsport, TN and was formerly owned by SCP 2001A-CSF-76 LLC; this entity was merged into ACLCP Kingsport, LLC in a 2024 Merger transaction pursuant to an Agreement and Plan of Merger dated January 5, 2024, a copy of which is

attached to this Complaint as Exhibit G.  As of the date of this Complaint, $423,478 of the rents trapped in the Interpleader Cases are attributable to this Property. ACLCP Kingsport, LLC was merged into ACLCP Port Huron, LLC in the 2025 Merger.

- The "South Euclid" Property is located at 4460 Mayfield Road, South Euclid, OH and  was formerly owned by SCP2001A-CSF-61 LLC; this entity was merged into ACLCP South Euclid, LLC in a merger transaction pursuant to an Agreement and Plan of Merger dated January 5, 2024, a copy of which is attached to this Complaint as Exhibit H.  The Lease for this Property had an expiration date of January 31, 2024.  It was not renewed by CVS and CVS claims that it physically vacated this Property on or about the expiration date. However, the Property remains physically occupied by a subtenant of CVS that has not removed and whose continued occupancy under Ohio law is attributable to CVS such that CVS is now a holdover tenant at this Property and owes approximately $1.5 million in unpaid and intentionally withheld rent with respect to this Property. ACLCP South Euclid, LLC was merged into ACLCP Port Huron, LLC in the 2025 Merger.

- The "Lancaster" Property is located at 333 Highway 9 Bypass E, Lancaster, SC and was formerly owned by SCP 2001A-CSF-72 LLC; this entity was merged into ACLCP Lancaster, LLC in a 2024 Merger transaction pursuant to an Agreement and Plan of Merger dated January 5, 2024, a copy of which is attached to this Complaint as Exhibit I.  As of the date of this Complaint, $318,828 of the rents trapped in the Interpleader Cases are attributable to this

Property. ACLCP Lancaster, LLC was merged into ACLCP Port Huron, LLC in the 2025 Merger.

- The "Port Huron" Property is located at 940 Lapeer Avenue, Port Huron, MI and was formerly owned by SCP 2002E-36 LLC; this entity was merged into ACLCP Port Huron, LLC in a 2024 Merger transaction pursuant to an Agreement and Plan of Merger dated January 8, 2024, a copy of which is attached to this Complaint as Exhibit J. As of the date of this Complaint, the rent holiday provision in the applicable Lease is still operable and no rent is due until early 2028. Accordingly, none of the rents trapped in the Interpleader Cases are attributable to this Property. ACLCP Port Huron, LLC is a Debtor and the successor entity to each of the following companies and all their assets: ACLCP North Vernon, LLC, ACLCP Kingsport, LLC, Walterboro, LLC ACLCP South Euclid, LLC and ACLCP Lancaster, LLC.

49.    As a result of the 2025 Merger, ACLCP Port Huron, LLC is entitled to a total of $2,276,226 of Funds improperly being withheld from it pursuant to the Interpleader Cases.

**C.** *Phillip Kassover and His Baseless Claims*

51.    The Original LLCs were previously wholly owned by intermediate entities that were all wholly owned by GCC. Non-party Allerand Realty Holdings, LLC (or a predecessor entity), which is an affiliate of each of the Debtors' sole member – ACLCP Managerco LLC –, and Defendant Kassover were both creditors of GCC as more fully described herein.

52.    Defendant Kassover purportedly became a creditor of GCC in a prior action commenced in New York by Defendant Kassover and his mother captioned *Ruth Kassover as Co-Executor of the Estate of Nathan Kassover et al. v. Prism Venture Partners, LLC et al.*, Index No.

602434/2005 (the "*Kassover v. Prism Action*").  In such action, on July 8, 2010, judgment was entered in Defendant Kassover's favor in the amount of $293,606.00 and in favor of his mother, Ruth Kassover, as Executor of the Nathan Kassover Estate, in the amount of $1,181,565.00 for a total of $1,475,171.00 against GCC (the "Kassover Judgment").

53.    After the Kassover Judgment was entered, GCC was the subject of two bankruptcy proceedings, the latest of which was an involuntary Chapter 7 bankruptcy proceeding that was commenced in September 2011.  The *Kassover v. Prism Action* giving rise to the Kassover Judgment was automatically stayed during the pendency of both GCC bankruptcy cases.  However, the bankruptcy court lifted the automatic stay in the later GCC case and allowed the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida to enter a judgment in favor of Allerand 675 Company, LLC in the sum of $1,500,445.48 on January 14, 2016. The Allerand Judgment was subsequently assigned by Allerand 675 Company, LLC to an affiliate or predecessor of Allerand Realty Holdings, LLC.  The Chapter 7 bankruptcy proceeding was dismissed by the bankruptcy court, and the automatic stay was lifted on July 14, 2016.

54.    Nine months after the GCC Chapter 7 bankruptcy proceeding was dismissed, in April 2017, Defendant Kassover made a motion in the *Kassover v. Prism Action* for the turnover of GCC's assets, in an effort to satisfy the Kassover Judgment.  By an Order dated September 1, 2017, the New York Court granted Defendant Kassover's request for a turnover order, and ruled that GCC's personal property and funds were to be turned over to be sold at auction by the New York County Sheriff and then the sale proceeds would be applied to satisfy the Kassover Judgment (A true and correct copy of the September 2017 Order is attached as Exhibit K).

55.    The September 2017 Order specifically states, in pertinent part, as follows:

> For the foregoing reasons, it is ORDERED and ADJUDGED, that plaintiffs' motion is granted to the extent of:

(1) **directing defendant GCC to turnover, forthwith, to the New York County Sheriff for auction GCC's 100% membership interest in any of the following entities. . . [the Debtors and all the other Allerand-related entities]...** that are presently owned by GCC along with any documents required to effectuate the Sheriff's sale of the ownership interests, and apply the proceeds of the sale to the satisfaction of the July 2008 judgment obtained by plaintiffs against GCC (with the amounts as modified by the First Department on July 8, 2010);

(2) **directing defendant GCC, to turnover, forthwith, to the New York County Sheriff for auction any/all other personal property and assets in which GCC has any interest** and apply the proceeds of the sale to the satisfaction of the July 2008 judgment obtained by plaintiffs against GCC (with the amounts as modified by the First Department on July 8, 2010); and

(3) **directing defendant GCC, to turnover, forthwith to the New York County Sheriff** for payment to Plaintiffs any cash GCC owns including **rents or other lease payments paid or to be paid to GCC or its Entities** up to the amount of the Judgment plus post-judgment interest; . . .

56.     Before the 60-day priority period pursuant to New York State Civil Practice Law and Rules §5234 expired, Defendant Kassover moved by Order to Show Cause for an extension of the priority period and also requested that Defendant Kassover be appointed as "attorney-in-fact" for the limited purpose of signing documents on GCC's behalf to facilitate the sale of the property at a Sheriff's auction.

57.     The Order expressly limited the scope of the appointment being sought by Kassover as follows:

Appointing Philip Kassover as attorney-in-fact for GCC **for the limited purpose of executing document**s on GCC's behalf to, pursuant to the Order, **effectuate the sale of its property at a Sheriff's auction. . .**

(A true and correct copy of the Order to Show Cause that was signed by the New York Court on October 17, 2017 is attached as Exhibit L).

23

58.      Defendant Kassover's counsel submitted an Affirmation in support of the Order to Show Cause, dated October 16, 2017, in which he specifically stated that Defendant Kassover was seeking to be appointed as attorney-in-fact for "the sole purpose" of signing documents to effectuate the sale of GCC's assets at a Sheriff's auction:

> As explained above, despite diligent efforts, Plaintiffs have been unable to locate any individual or entity with authority to execute documents or otherwise act on GCC's behalf. Such individual or entity, however, will be necessary to effectuate the sale of the Entities to the Sheriff's auction. Accordingly, Plaintiffs respectfully request **an order appointing plaintiff Phillip Kassover as attorney-in-fact for GCC for the sole purpose of executing documents on GCC's behalf to effectuate the sale of the Entities** and any other of its personal property at the Sheriff's auction.

(A true and correct copy of such Affirmation is attached hereto as Exhibit M).

59.      By an Order dated November 1, 2017, the New York Court granted Defendant Kassover's Order to Show Cause, which extended Defendant Kassover's priority for 180 days and appointed him attorney-in-fact with the limited power of executing documents on behalf of GCC to effectuate the sale of GCC's assets by the Sheriff pursuant to the September 2017 Order: A true and correct copy of such order is attached hereto as Exhibit N.

60.      The limited attorney-in-fact appointment has long since expired, as has the priority accorded to Kassover's claims against GCC or any of its assets, but Kassover has continued to use this limited and expired attorney-in-fact designation to insert himself into the business relationships of Allerand and its affiliates, including the Debtors.  Notably, long before the commencement by CVS of the Interpleader Cases, Defendant Kassover has sought to exert control over the Properties and claim rights to future rent payments due to the Debtors but CVS, knowing that Kassover's claims were bogus, declined to engage with him.

61.      The New York Court granted Defendant Kassover the extremely limited power to execute documents in the name of GCC only and limited only to instruments to facilitate the sale

of GCC's assets by the New York County Sheriff as a practical way to implement its Turnover Order. Defendant Kassover's powers as "attorney-in-fact" extended no further than the assignment or transfer of GCC assets to the New York County Sheriff so that a sale could follow. Defendant Kassover has no power to direct rents from individual Properties, or do anything other than the ministerial act of signing the assignment and transfer documents to cause the New York County Sheriff to have title to the GCC assets to facilitate a proper foreclosure sale thereof.

62.     Defendant Kassover's appointment was limited to signing documents in connection with the sale of GCC's assets at auction by the New York County Sheriff. Kassover moved for an extension of his priority period multiple times, last time resulting in an Order, granting Kassover an additional 120 days, to December 20, 2018. (A true and correct copy of the Order and the transcript of the oral argument are collectively attached hereto as Exhibit O.

63.     Defendant Kassover did not effectuate the sale of GCC's assets by the New York County Sheriff prior to the expiration of the extended 120-day priority period in December 2018. In fact, Defendant Kassover's counsel directed the New York County Sheriff not to move forward with selling the assets at auction, for reasons unknown. Attached hereto as Exhibit P is a true and correct copy of an undated email from Defendant Kassover's counsel to the New York County Sheriff, instructing the Sheriff not to "move forward".

64.     Incredibly, even as of the date of this Complaint, no assignment document has ever been delivered by Kassover, and the New York County Sheriff has formally closed his file without ever conducting any sale in satisfaction of the Kassover Judgment.

65.     Long after Kassover's priority period and power of attorney had expired, on March 27, 2023, an affiliate of Allerand foreclosed its own competing judgement lien against the GCC assets which indirectly included the Original LLCs and the Properties. As the successful bidder in

that regularly conducted and lawful foreclosure sale, the Allerand affiliate became the free and clear owner of all the Original LLCs and the Properties and both GCC and Kassover ceased to have any claim to any thereof. Attached hereto as Exhibit Q are copiers of the Certificates of Title issued by the Florida court confirming that the Debtors are the true successor owners of the Properties. CVS was fully aware of these facts when it caused the Interpleader Cases to be filed.

66.     Defendant Kassover has made claims that all of the Properties owned by each of the Debtors are, in fact, owned by him.  Those claims are meritless.

67.     Defendant Kassover has made claims that rents owed under leases with CVS and the CVS Tenant Entities are due and owing to him.  Those claims are meritless.

68.     On or about December 5, 2023, counsel for CVS sent letters (the "December CVS Letters") to the Debtors and the Debtors' affiliates stating that CVS would withhold rents from all the Properties and interplead them in in separate interpleader cases if the Debtors could not produce a joint written instruction from Kassover consenting to the payment of the rents to the Debtors. Copies of these letters are annexed to this Complaint as Exhibit R.

69.     Defendant Kassover refused to consent to the payment of the rents to the Debtors.

70.     In response to the December CVS Letters, on January 17, 2024 the Debtors sent to CVS's counsel indisputable documentary proofs, copies of which are attached to this Complaint as Exhibit A, that the claims of Defendant Kassover were baseless and unmeritorious and that the Debtors were entitled to all the rents from the Properties.

71.      CVS and its counsel deliberately and maliciously ignored all such proofs and, without justification in the circumstances, filed and has thereafter wrongfully pursued the Interpleader Cases with the sole purpose of harming the Debtors and their affiliates.

**D.** *The Remainder Parties*

72.    Defendant C Remainderco once held a remainder interest in the equity of SCP 2001A-CSF-51 LLC. That remainder interest was duly and legally canceled in the 2024 Mergers and replaced with a 65% common membership interest in ACLCP Cincinnati, LLC and a right to a fair appraisal in the event of a dispute over the value of the interest issued to C Remainderco.

73.    Defendant Gottesman and Defendant C Remainderco have made claims that SCP 2001A-CSF-51 LLC continues in existence independently of ACLCP Cincinnati, LLC, and that Defendant C Remainderco is the sole owner of SCP 2001A-CSF-51 LLC and is thereby the sole beneficial owner of the Cincinnati Property.

74.    Defendant Gottesman and Defendant C Remainderco have made claims that C Remainderco and SCP 2001A-CSF-51 LLC are the sole owners of all rents attributable to the Cincinnati Property collected from May 11, 2024 to the present.

75.    None of the above claims by Defendant C Remainderco and Defendant Gottesman is meritorious.

76.    Defendant NV Remainderco once held a remainder interest in the equity of SCP 2001A-CSF-18 LLC. That remainder interest was abandoned, never vested in possession and was duly canceled in the 2024 Mergers in accordance with applicable Delaware law.

77.    Defendant Gottesman and Defendant NV Remainderco have made claims that SCP 2001A-CSF-18 LLC continues in existence independently of ACLCP North Vernon, LLC and that NV Remainderco is the sole owner of SCP 2001A-CSF-18 LLC and thereby the sole beneficial owner of the North  Vernon Property.

78.     Defendant Gottesman and Defendant NV Remainderco have made claims that NV Remainderco and SCP 2001A-CSF-18 LLC are the sole owners of all rents attributable to the North  Vernon Property collected from May 11, 2024 to the present.

79.     None of the above claims by Defendant Gottesman or Defendant NV Remainderco is meritorious.

80.     Defendant WB Remainderco once held a remainder interest in the equity of SCP 2001A-CSF-75 LLC. That remainder interest was abandoned, never vested in possession and was duly canceled in the 2024 Mergers in accordance with applicable Delaware law.

81.     Defendant CFNJ and Defendant WB Remainderco, LLC have made claims that SCP 2001A-CSF-75 LLC continues in existence independently of ACLCP Walterboro, LLC and that Defendant WB Remainderco, LLC is the sole owner of SCP 2001A-CSF-75 LLC and thereby the sole beneficial owner of the Walterboro Property.

82.     Defendant CFNJ and Defendant WB Remainderco have made claims that WB Remainderco and SCP 2001A-CSF-75 LLC are the sole owners of all rents attributable to the Walterboro Property that have been trapped in the Interpleader Cases.

83.     None of the above claims by Defendant CFNJ and Defendant WB Remainderco is meritorious.

84.     Each of the 2024 Mergers is fully effective, complies with all applicable law and all governing documents of the participants in such Merger, was entered into in good faith and for good and valuable consideration, is enforceable in accordance with its terms, and has extinguished any rights of Defendant Kassover in any Property or any Lease or any Funds.

85.     As a result of the 2024 Mergers, none of Defendants Gottesman, NV Remainderco, CFNJ and WB Remainderco owns any interest in any Property or any Lease or any Funds.

86.     The 2025 Merger is fully effective, complies with all applicable law and all governing documents of the participants in such Merger, was entered into in good faith and for good and valuable consideration, and is enforceable in accordance with its terms.

## COUNT I
### (Declaratory Relief against all Defendants)

87.     The Debtors repeat and reassert the averments of the foregoing paragraphs as if fully set forth herein.

88.     An actual present controversy exists between the Debtors and the Defendants concerning the right to receive payment of rents and interpleaded Funds.

89.     The CVS Tenant Entities have created chaos and uncertainty for the Debtors based on old, disproven, meritless and unfounded title claims to the Properties and the entities that originally owned them.  Defendant Kassover is not an owner of Properties, for among other reasons, the 2024 Mergers.  The 2024 Mergers definitively cancelled any interest Defendant Kassover could possibly have had in respect of the ownership of the Original LLCs or the Properties.

90.     Nevertheless, this unfounded dispute over title has been used by CVS and the CVS Tenant Entities to withhold from the Debtors all the rents payable in respect of the Properties and to commence and continue, in bad faith, the Interpleader Cases.  This conduct was intended to and in fact did starve the Debtors of operating capital and other revenue critical to the financial survival of the Debtors. It has deprived the Debtors of all operating funds, clouded the title to all the Properties so as to prevent sale or financing transactions that could generate funds and otherwise has made impossible the continuation of the Debtors' business.

91.    The Debtors have been harmed by the claims asserted by Defendants in the Properties and the Original LLCs and have been denied millions of dollars in rents payable immediately.

92.    The Debtors have been harmed by the claims asserted by the Defendants because title to the Properties, the Funds and the Leases has been effectively clouded by uncertainty regarding ownership.

93.    There exists – as a result of the conduct of Defendants – a substantial controversy between the Debtors and the Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment under 28 U.S.C. § 2201.

94.    A judgment of the Court on the claims set forth herein will clear title and allow the Debtors to operate again.

95.    A prompt judicial determination of the respective rights of the parties' respective rights, status, and other legal relations in these respects is necessary and appropriate.

WHEREFORE, the Debtors seek a declaration pursuant to Bankruptcy Rule 7001 that:

A.    The 2024 Mergers have extinguished any remainder interest once existing in any Original LLC and any interest Kassover had or could have had in any Original LLC or in any successor to any Original LLC.

B.    The Debtors are successors to, and successors in interests of, all the Original LLCs and are the sole owners of all the Properties, the Leases and the Funds.

C.    The Debtors ACLCP Port Huron, LLC ACLCP Gratiot, LLC and ACLCP Cincinnati, LLC, are the sole landlord parties to all the extant Leases for the Properties.

D.    Defendant CVS has falsely asserted that Defendant Kassover has a claim to or interest in the Properties, the Leases and the Funds.

E.      Defendant Kassover has falsely asserted a claim to or interest in the Properties, the Leases and the Funds.

F.      Defendants Gottesman, C Remainderco, NV Remainderco, CFNJ and WB Remainderco have falsely claimed that certain of the 2024 Mergers are void, and therefore (i) C Remainderco owns the Cincinnati Property and Lease and all the Funds derived therefrom; (ii) NV Remainderco owns the North Vernon Property and Lease and all the Funds derived therefrom; and WB Remainderco owns the Walterboro Property and Lease and all the Funds derived therefrom.

G.      Defendant Kassover has no claim or interest in any Debtor, Original LLC, Lease or Property.

H.      The Debtors – as successors to the Original LLCs – are entitled to collect all rents due under the Leases on account of the Debtors' interests in the Properties and the Leases and are entitled to the immediate release of all the Funds.

I.      The Debtors have been denied rents due under the Leases on account of the Debtors' interests in the Properties and the Leases due to the meritless claims of Defendant Kassover, Defendant Gottesman, Defendant C Remainderco, Defendant NV Remainderco, Defendant CFNJ and Defendant WB Remainderco.

J.      ACLCP Cincinnati, LLC is the successor to a Delaware limited liability company named SCP 2001A-CSF-51 LLC and the members of ACLCP are C Remainderco as to a 65% interest and ACLCP Managerco, LLC, as to a 35% managing member interest.

K.      ACLCP Gratiot, LLC is the successor to a Delaware limited liability company named SCP 2002E-35 LLC and the members of ACLCP are Detroit-Gratiot Remainderco,

LLC as to a 65% interest and ACLCP Managerco, LLC, as to a 35% managing member interest.

## COUNT II
### (Turnover against all Defendants)

96.     The Debtors repeat and reassert the averments of the foregoing paragraphs as if fully set forth herein.

97.     CVS filed the Interpleader Cases depositing the Funds in an amount not less that $2.27 million in various courts around the United States.  The Funds remain in those courts.

98.     The only parties who have made a claim or assert any interest in the Funds are Defendants herein.

99.     The Funds are property of the Debtors' estates.

100.    Under 11 U.S.C. § 1306, the Debtors are entitled to possess all property of the estate.

101.    Under the particular facts and circumstances, and applicable law, the Debtors are entitled to possession of the Funds for "use" as contemplated in 11 U.S.C. § 363.

102.    Nonetheless, the Debtors have not been able to possess or use the Funds, due to the assertions and acts of Defendants.

103.    Any party holding the Funds, or any portion thereof, should be compelled to turnover the Funds to the Debtors pursuant to Fed. R. Bankr. P. 7001(1) and 11 U.S.C. § 542(a), or alternatively, should be directed to permit the transfer of the Funds to the Debtors, as debtors in possession.

WHEREFORE, the Debtors seek a judgment and implementing Order directing any party holding the Funds to turn over the Funds to the Debtors to be held by the Debtors until further Order of the Bankruptcy Court.

## COUNT III
### (Equitable Subordination against Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, and WB Remainderco)

104.   The Debtors repeat and reassert the averments of the foregoing paragraphs as if fully set forth herein.

105.   Each of Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, and WB Remainderco has engaged in conduct to willfully and wrongfully deny the Debtors access and control to the Funds, even though none of such Defendants has any credible claim that any of the Funds belong to any party other than the Debtors, or any claim or interest in the Properties or the Funds derived from ownership of the Properties.  Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, and WB Remainderco either have never had any interest in the Properties or their respective interest, if any, has been canceled or converted to a different interest by mergers or other transactions described herein.

106.   The Debtors have been harmed by Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, and WB Remainderco's conduct, including the loss of revenue, operating capital, and the inability to use the Properties as collateral for loans and other purposes.

107.   To the extent any of Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, or WB Remainderco asserts claims with respect to any Property described herein, those claims should be subordinated to the claims of the Debtors to such Property and to the Funds.

108.   To the extent any of Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, or WB Remainderco asserts a claim or interest in any of the Debtors, those claims should be subordinated to the claims of other claimants or interest holders of the Debtors.

WHEREFORE, the Debtors seek a judgment equitably subordinating any claim or interest of Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, and WB Remainderco in the

Funds to the claims and interests of the Debtors in such Funds, and further a judgment subordinating the claim or interest of any of Kassover, Gottesman, NV Remainderco, C Remainderco, CFNJ, or WB Remainderco who asserts a claim or interest in the Debtors to claims of other claimants or interest holders of the Debtors such that the claims are extinguished.

### COUNT IV
### (Breach of Contract Against CVS and CVS Tenant Entities)

109.    The Debtors repeat and reassert the averments of the foregoing paragraphs as if fully set forth herein.

110.    CVS and the CVS Tenant Entities, on the one hand, and the Debtors, on the other hand, are parties to the Leases for the use of the Properties by CVS and the CVS Tenant Entities.

111.    One of the obligations under the Leases is the obligation of CVS and the CVS Tenant Entities to pay rent to the Debtors.  Rent is due and owing in accordance with the terms of the Leases.

112.    For years, CVS and the CVS Tenant Entities knew of Defendant Kassover and knew about his baseless claims relating to the Properties.

113.    Prior to December 2023, CVS and the CVS Tenant Entities knew the statements of Kassover regarding his purported interests in some of the Properties were baseless and unfounded. CVS and the CVS Tenant Entities also knew that Kassover's claims could never amount to more than a small portion of the value of rent owed by CVS and the CVS Tenant Entities for use and occupation of the Properties.

114.    Prior to the institution of the Interpleader Cases CVS and the CVS Tenant Entities knew that any possible interest Kassover might have had in the properties or the Original LLCs had been canceled in the 2024 Mergers.

115.    In fact, prior to the institution of the Interpleader Cases, the Debtors and representatives of the Debtors had provided CVS and the CVS Tenant Entities with copious documentation regarding title to the Properties and proof that Kassover had no valid claim thereto. Nevertheless, CVS and the CVS Tenant Entities desired to exert unfair pressure on the Debtors' control parties to settle over $7 million of claims they and their affiliates held against CVS and its affiliates.

116.    On or about February 1, 2024, CVS and the CVS Tenant Entities maliciously and in bad faith instituted the five Interpleader Cases, in violation of covenants under their leases with the Debtors.   In doing so, CVS and the CVS Tenant Entities intentionally and unjustifiably withheld rent due under the Leases.

117.    The act to withhold rent from the Debtors is a breach by CVS and the CVS Tenant Entities under the Leases between CVS and the CVS Tenant Entities, on the one hand, and the Debtors, on the other.

118.    The Debtors have been severely damaged by the breach of CVS and the CVS Tenant Entities.   Among other things, the Debtors have been denied use of rent, stripped of operating capital, and rendered insolvent.   The breaches of CVS and the CVS Tenant Entities have also clouded title of assets belonging to the Debtors.

WHEREFORE, the Debtors seek a judgment for breach of contract against CVS and the CVS Tenant Entities in an amount not less than $3 million, together with an award of attorneys' fees, and pre- and post-judgment interest.

**COUNT V**
**(Breach of the Duty of Good Faith and Fair Dealing**
**Against CVS and CVS Tenant Entities)**

119.    The Debtors repeat and reassert the averments of the foregoing paragraphs as if fully set forth herein.

120.    CVS and the CVS Tenant Entities, on the one hand, and the Debtors, on the other hand, are parties to the Leases.  Under the Leases, CVS and the CVS Tenant Entities are obligated to pay rent to the Debtors.  Rent is due and owing in accordance with the terms of the Leases.  CVS and the CVS Tenant Entities also have an obligation to act in good faith with respect to the Debtors.

121.    For many years prior to December 2023, CVS and the CVS Tenant Entities knew about Kassover, and that the statements of Kassover made regarding his purported interests in some of the Properties were baseless and unfounded.  CVS and the CVS Tenant Entities also knew that Kassover's claims-even if true- could never amount to more than a small portion of the value of rent owed by CVS and the CVS Tenant Entities for use and occupation of the Properties.

122.    Prior to the institution of the Interpleader Cases, CVS and the CVS Tenant Entities knew that any possible interest Kassover might have had in the properties or the Original LLCs had been canceled in the 2024 Mergers.

123.    Prior to the institution of the Interpleader Cases, the Debtors and representatives of the Debtors had provided CVS and the CVS Tenant Entities with documentation regarding title to the Properties and proof that Kassover had no claims.  Nevertheless, CVS and the CVS Tenant Entities desired to exert unfair pressure on the Debtors' control parties to settle over $7 million of claims they and their affiliates held against CVS and its affiliates.

124.    CVS and the CVS Tenant Entities also know that the value of the Properties in January 2024 exceeded $15 million.  The huge disparity in these figures underscores dramatically the fact that CVS could not possibly have been acting in good faith when it threatened to file the Interpleader Cases in 2023, when it refused to engage with the Debtors after the Debtors provided proof of the foregoing matters in 2024, when it spitefully filed the multiple Interpleader Cases and even now in 2025 as it continues to prosecute those cases when the total of interpleaded funds is

more than six (6) times greater than the maximum amount that Kassover could ever possibly hope to recover from the Properties or CVS.

125.    CVS and the CVS Tenant Entities filed the Interpleader Cases to effectively cloud title of the otherwise unencumbered Properties – which were not subject to any secured debt – and starve the Debtors of operating capital and thereby force the Debtors and an affiliate of the Debtors, AP Orangevale, to compromise or abandon  multiple claims against CVS and the CVS Tenant Entities and other affiliates of CVS.

126.    The true purpose and intended effect of the Interpleader Cases was to harm the Debtors and their affiliates, not to protect CVS and the CVS Tenant Entities.  To defend the Interpleader Cases, the Debtors were forced to hire three sets of counsel in five jurisdictions.  To date, the defense of the five Interpleader Cases in five separate District Courts has already cost the Debtors hundreds of thousands of dollars and has rendered the Debtors insolvent despite their having full entitlement to the over $2.27 million of Funds held in suspense in those courts on spurious and unfair grounds. This figure is not inclusive of over $3 million owed by CVS to AP Orangevale and over $1.5 million owed to Debtor ACLCP Port Huron, LLC in respect of the South Euclid, Indiana Property.

127.    By abusing the interpleader process to withhold millions of dollars in rent from the Debtors and their non-debtor affiliates and causing them to spend hundreds of thousands of dollars on legal and other costs in five separate cases, CVS and the CVS Tenant Entities expect to hobble the common business enterprise engaged in by the Debtors and other affiliates and to kill that enterprise by a thousand cuts or force it to needlessly compromise debts owed by CVS to the enterprise in an amount in excess of $7 million.

WHEREFORE, the Debtors seek a judgment for breach of the duty of good faith and fair dealing against CVS and the CVS Tenant Entities in an amount not less than $2.27 million, together with an award of attorneys' fees, and pre- and post-judgment interest.

### COUNT VI
### (Tortious Interference with Contract Against CVS and CVS Tenant Entities)

128.    The Debtors repeat and reassert the averments of the foregoing paragraphs as if fully set forth herein.

129.    The purpose of the Debtors is to own and manage the Properties for business purposes, including to generate income and other revenue.

130.    The Debtors are parties to documents and agreements with third parties, including interest holders, and own the Properties by way of title documents and other internal operating documents that are known to CVS and the CVS Tenant Entities.

131.    Prior to the institution of the Interpleader Cases, the Debtors and representatives of the Debtors had provided CVS and the CVS Tenant Entities with documentation regarding title to the Properties, including proof that Kassover had no claims.

132.    Nevertheless, CVS and the CVS Tenant Entities desired to exert unfair pressure on the Debtors' control parties to settle over $7 million of claims they and their affiliates held against CVS and its affiliates.

133.    Prior to the institution of the Interpleader Cases, CVS and the CVS Tenant Entities also knew that the Kassover claims—even assuming, for the sake of argument only, that all of his fantastic claims were sustained in full—could never exceed $377,000.  CVS and the CVS Tenant Entities also know that the value of the Properties in January 2024 exceeded $15 million.

134.    CVS and the CVS Tenant Entities filed the Interpleader Cases to harm the Debtors, to interfere with the ownership interests of the Debtors, to effectively cloud title of the otherwise

unencumbered Properties – which were not subject to any secured debt – and starve the Debtors of operating capital and thereby force the Debtors and an affiliate of the Debtors, AP Orangevale, to compromise or abandon  multiple claims against CVS and the CVS Tenant Entities and other affiliates of CVS.  Among other outcomes of the Interpleader Cases, the Debtors cannot obtain financing for the otherwise unencumbered Properties.

135.    To defend the Interpleader Cases, the Debtors were forced to hire three sets of counsel in five jurisdictions.  To date, the defense of the five Interpleader Cases in five separate District Courts has already cost the Debtors hundreds of thousands of dollars and has rendered the Debtors insolvent despite their having full entitlement to the over $2.27 million of Funds held in suspense in those courts on spurious and unfair grounds. This figure is not inclusive of over $3 million owed by CVS to AP Orangevale and over $1.5 million owed to Debtor ACLCP Port Huron, LLC in respect of the South Euclid, Indiana Property.

136.    By abusing the interpleader process, CVS and the CVS Tenant Entities expect to interfere with the Debtors' affairs, agreements and other documents by which the Debtors manage their affairs, and which give the Debtors control and use of the Properties as the Debtors see fit.

WHEREFORE, the Debtors seek a judgment for tortious interference of contract against CVS and the CVS Tenant Entities and for compensatory, consequential and punitive damages in an amount not less than $2.27 million, together with an award of attorneys' fees, pre- and post-judgment interest.

## COUNT VII
### (Disallowance of Claims of all Defendants)

137.    The Debtors repeat and reassert the averments of the foregoing paragraphs as if fully set forth herein.

138.    Each of the Defendants has engaged in conduct to wrongfully deny the Debtors access to the Funds, even though none of the Defendants have a credible claim to Properties or the Funds derived from ownership of the Properties.  Defendants either have never had any interest in the Properties or their interest, if any, canceled or converted to a different interest by mergers or other transactions described herein.

139.    To the extent the Court enters a judgment or order against any Defendant, including directing turnover of the Funds to the Debtors, and any Defendant refuses to satisfy such judgment or turn over such Funds, or otherwise takes action to deny the Debtors the Funds, the respective Defendant's claim or interest, if any, against or in the Debtors should be disallowed pursuant to 11 U.S.C. § 502(d).

WHEREFORE, the Debtors seek entry of an order disallowing any and all claim(s) and/or interest(s) filed or held by the Defendants against the Debtors in these chapter 11 cases.

Dated: September 12, 2025
Wilmington, Delaware

CROSS & SIMON, LLC

*/s/ Christopher P. Simon*
Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
1105 North Market Street, Suite 901
Wilmington, Delaware 19801
Telephone: (302) 777-4200
csimon@crosslaw.com
kmann@crosslaw.com

*Proposed Counsel to the Debtors*